**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| SARAH FREELE, individually and as next friend of M.F., a minor, | § § § | |
| | § | Civil Action No. |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | COMPLAINT |
| ADT LLC, | § | |
| | § | |
| Defendant. | § | JURY DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COME** Plaintiffs Sarah Freele, individually and as next friend of M.F., a minor, ("Plaintiffs") complaining of Defendant ADT, LLC, ("Defendant"), and for causes of action, would respectfully show the Court as follows:

### I.      JURISDICTION AND VENUE

1.      This present action alleges violations of the Texas Deceptive Trade Practices Act, and negligent supervision and retention arising from Defendant's installation of security cameras in Plaintiff's home and Defendant's employee's unfettered access to those security cameras to virtually intrude into Plaintiffs' home and systematically spy on Plaintiffs' private lives.

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

3.      This Court has personal jurisdiction over Defendant because Defendant has conducted and does conduct business in the State of Texas. Specifically, Defendant contracted with Plaintiff, Sarah Freele, for the provision of security services in her home in Dallas, Texas,

and it was in Plaintiffs' home, during the installation process, that Defendant's employee improperly accessed Plaintiffs' security system and gained improper access to Plaintiffs' in-home security cameras. This Court also has personal jurisdiction over Defendant, who does not reside in Texas, pursuant to the Texas long-arm statute because these Defendant has committed torts in whole or in part in the State of Texas. Tex. Civ. Prac. & Rem. Code § 17.042(2).

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

## II.    PARTIES

5.    Plaintiffs Sarah Freele, individually and as next friend of M.F., a minor, are citizens of Dallas County, Texas.

6.    Defendant ADT LLC ("ADT" and "Defendant") is a Delaware limited liability company with its principal place of business in Boca Raton, Florida. Accordingly, ADT is a citizen of Delaware and Florida. Service may be had upon ADT by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201-3136.

## III.    FACTS

7.    ADT is a home security company that touts its longstanding expertise in security and claims to have been providing security services since the 19th century. ADT claims that it has "145 years of experience to help protect your home." According to ADT, it has "been helping protect homes longer than any other company in the business." ADT provides residential security systems and monitoring plans that purportedly "protect what matters most in your life." In short, ADT promises that it is "fully committed to your security."[1]

8.    Unfortunately for Sarah Freele, the one thing that ADT failed to protect her from

---

[1] ADT Services | In-Home Consultation, Installation, Repairs, Customer Support,https://www.adt.com/services (last visited July 15, 2020).

was ADT itself.

**A.**      **ADT Promised to Keep Sarah Freele Safe with its Pulse System.**

9.      ADT markets and sells a comprehensive security system package that includes the hardware necessary to operate a home security system, the monitoring services that detect home intrusions and alert the police, and the security system installation.

10.      ADT offers various tiers of its home security systems at different price points. The basic tier, for example, features security monitoring equipment with 24/7 alarm monitoring while the highest tier home security package includes various convenience and home automation features.

11.      One of the highest tier home security packages is ADT Pulse. ADT Pulse allows consumers to "check on your home - even if you're away" by giving them remote access to control their home security system from a mobile application or a web browser portal. Specifically, consumers can arm and disarm their home security systems, remotely lock and unlock doors, view live camera footage, and control various smart home devices like a thermostat and lights:



The screenshot above from ADT's marketing materials clearly touts the supposed benefits of

ADT's Pulse system.[2]

12.     Consumers must purchase various smart devices from ADT to reap the benefits of the ADT Pulse service and all the advertised remote accessibility features. ADT touts that its smart home features are not only more convenient to consumers, but they provide "smarter security." For example, ADT claims that the purchase of its smart locks for use with the ADT Pulse system will result in a "whole new level of security and convenience…:"[3]



**More convenience.
Smarter security.**

Smart door locks add a whole new level of
security and convenience to a smart ADT
security system, allowing you to easily let
people in – or keep them out – remotely.

13.     Most importantly, ADT encourages consumers to purchase video cameras for both outdoors and indoors uses to "keep an eye on the things you value most."[4] The indoor cameras, according to ADT, are specifically intended to "check in on your kids" and can be set up to stream and capture video clips of events "like when your kids get home from school."[5]

14.     Consumers use the ADT Pulse mobile application to "check any or all of your ADT home security cameras" and to "look in on your family and your pets any time with live-streaming video." Furthermore, consumers are able view stored video clips from their security cameras on

---

[2] ADT Pulse® | Official ADT Smart Home Automation System,https://www.adt.com/pulse (last visited July 15, 2020).
[3] Wireless Home Security Cameras & Video Surveillance Cameras | ADT,https://www.adt.com/security-cameras (last visited July 15, 2020).
[4] Wireless Home Security Cameras & Video Surveillance Cameras | ADT,https://www.adt.com/security-cameras (last visited July 15, 2020).
[5] Shop ADT® Indoor Home Security Cameras | ADT, https://www.adt.com/indoor-security-camera (last visited May 7, 2020).

their phones via the ADT Pulse mobile application.

15.     To use the ADT Pulse smart home features—like remotely viewing security camera footage, disarming a security system, or unlocking smart locks—consumers must login into the ADT Pulse mobile application or the ADT Pulse web browser portal by using their username and password. Anyone with valid login credentials, like a family member, can access and control the security system remotely.

16.     For the ADT Pulse system to function correctly, an ADT technician needs to perform the system installation and configuration.

17.     Each new security system installation comes with a "worry-free professional installation" where "highly-trained ADT technicians will set-up your ADT security system so you don't have to."[6] ADT technicians will also test the security system and assist the consumer in connecting their smart phone to the ADT security system for use with ADT Pulse.

18.     ADT further promotes its security services by stating that its technicians are what sets them apart from the competitors in being able to earn its customers' trust and protect the most important people in their lives. According to its website: "Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced."[7]

19.     Moreover, ADT knows precisely how important the security of smart home devices is to consumers. ADT went out of its way to commission a survey of more than 1,200 consumers in December 2019, and found that 92% of consumers felt that "smart home security companies [like ADT] need to take measures to protect customers' personal data and information." And ADT

---

[6] ADT® | Compare Home Security System Packages | 2020, https://www.adt.com/compare(last visited July 15, 2020)
[7] Why ADT has the Best Home Security and Customer Service | ADT,https://www.adt.com/security-benefits (last visited May 7, 2020).

went so far as to issue a press release dedicated to saying it was doing just that, in order to "maintain consumer trust and promote responsible data privacy practices within the industry."

20.     The greatest concern that consumers had, revealed by ADT's survey, was "hacking." In response to those concerns, ADT boasted that it was leading the industry in creating a "Consumer Privacy Initiative," to create "clear guiding principles and best practices" for how security providers "manage consumer data and protect their privacy." Those principles included "Privacy by Design," promising to "embed[]" privacy "in all areas of the security industry," which "begins with the design of the products used to help protect and connect customers." They also included, specifically, "Handling of Audio and Video," claiming that security providers would share audio or video only with prior consent and would otherwise never "access a customer's audio or video without the customer's knowledge."[8]

21.     Unfortunately, ADT had a massive hole in its own internal processes and procedures that completely obliterated all of the promises that ADT made its Pulse customers, including Plaintiffs, regarding safety and security.

**ADT Allows its Employee to Spy on Sarah Freele and 200 other ADT customers.**

22.     A long-standing customer of ADT's, Sarah Freele contacted ADT in the summer of 2017 to have some security cameras added to her ADT home security system. Freele was preparing for a two-week vacation, and she wanted to ensure that her home was safe while she was away. In addition, Freele wanted to add an additional level of protection to her home to ensure that she and her minor son, M.F., were as safe as possible at all times.

23.     On July 27, 2017, ADT sent its employee, Telesforo Aviles, to Freele's home to

---

[8] *ADT Survey Reveals Strong Consumer Expectations for Smart Home Privacy Protections*, ADT (Jan.27, 2020), https://investor.adt.com/press-releases/press-release-details/2020/ADT-Survey-Reveals-Strong-Consumer-Expectations-for-Smart-Home-Privacy-Protections/default.aspx (permanent link available at https://cite.law/RNP5-BT3U).

install the new security cameras in conjunction with the upgrade to ADT's Pulse system in Ms. Freele's home. Freele met Aviles at her home, and Freele spoke extensively with Aviles about the use of the new cameras that he was installing. Freele remained at her home with Aviles while he installed the cameras onto her existing ADT home security system. Aviles placed the new cameras inside Freele's bedroom and inside the bedroom of her minor son, M.F. The location of the cameras, both of which were placed on top of dressers in the bedrooms, made it possible to view the entire room, including the beds and the people in them.

24.    It was at Aviles' insistence that the cameras were installed in Plaintiffs' bedrooms. Freele actually questioned Aviles about whether or not it was necessary to place the cameras in the bedrooms, because of the intimacy of those rooms, and Aviles told her that it was necessary because a burglar could enter the house through the bedroom windows, and the cameras would monitor that. Of course, Aviles' placement of the cameras had nothing to do with potential burglars. Instead, his camera placement had everything to do with Aviles ensuring that he had the most interesting vantage point when spying on Freele and M.F.

25.    At all times, Aviles was an employee of ADT and was acting in the course and scope of his employment by ADT. Aviles' actions were within his general authority, in furtherance of ADT's business, and for the accomplishment of the object for which ADT was hired.

26.    Freele was required to provide an email address to be associated with her ADT security account so that she could access her security system, including the newly-installed cameras, which she could view both on ADT's web-based platform and on the ADT app.

27.    Unbeknownst to Freele, while Aviles was installing the new cameras in her home, Aviles used the access provided to him as an ADT employee to enter his own email address into Freele's security account. This simple act—entering his own email address during the time of installation—allowed Aviles unfettered access to Freele's entire security system. Shockingly, this

access included unrestricted viewing of the security cameras inside Freele's bedroom and that of her son. Simply put, in a matter of seconds, Aviles was easily able to gain unlimited access to the most private and intimate aspects of Plaintiffs' lives.

28.     Following the installation, no one from ADT called  Freele to verify that the email addresses associated with her account were, in fact, hers. Such a process would have taken only seconds, but ADT did absolutely nothing to ensure that the information entered in  Freele's account was, in fact, Freele's. Freele had absolutely no idea that ADT's employee had added his email address to her security system account. Freele also had no idea that Aviles would immediately begin logging onto her account and watching Freele and her son on the very cameras that Aviles insisted be installed in their bedrooms.

29.     Over the course of the next three months, until the end of October 2017, Aviles logged onto Freele's security system and viewed her cameras over ***389 TIMES***. This means that every single day, multiple times a day, for three full months, Aviles peered into Freele's and her son's bedrooms and freely watched them from behind his computer screen. There is no doubt that Aviles saw the most intimate aspects of Freele's life; there is no doubt that he saw Freele after she showered, while she was changing clothes, and while she was sleeping. There is also no doubt that Aviles saw the most intimate aspects of M.F.'s life, and at the time, M.F. was only thirteen years-old.

30.     Unfortunately, Freele had no idea that Aviles was watching her for three full months. Freele could not see Aviles even though he could easily see her. Freele had no idea that the very company that she trusted to keep her secure, ADT, had wantonly intruded on the most intimate and private parts of her life.

31.     Freele did not learn that ADT's employee had been watching her on her ADT security cameras until ADT notified Freele of this fact in April of 2020. Apparently, over the

course of **seven years**, Aviles had been entering his email address into the security systems of hundreds of ADT's customers, just like Freele, when Aviles would go to those customer's homes to install ADT security cameras. According to ADT, Aviles had spied on at least 220 ADT customers over the course of seven years simply by entering his email address into the customer's ADT security accounts when he was installing cameras in their homes.

32.     For seven years, ADT allowed its employee unbridled access to the most intimate aspects of its customers' lives. For seven years, ADT did nothing to ensure that its customers were, in fact, safe and secure. For seven years, ADT did nothing to verify that the email addresses associated with its customers' accounts actually belonged to its customers. Under the guise of safety and security, ADT allowed Aviles to wantonly violate its customers' lives and to intrude in the very homes that ADT was falsely promising to keep safe.

33.     This type of access could only occur because ADT failed to implement adequate procedures that would prevent non-household members from adding non-household email addresses to the ADT Pulse accounts. Similarly, ADT failed to monitor consumers' accounts and promptly alert them anytime a new email address was added to their accounts. ADT could have imposed countless checks on its system and its employee in order to prevent, or at least stop this conduct. Instead, this breach came to light only by luck and happenstance: a customer, reporting a technical issue, inadvertently revealed Aviles' unwanted and improper access. But for that event, ADT would still be unaware of this invasive conduct and it would have continued, unabated, to this day.

34.     Unfortunately, Freele relied on ADT's representations about ensuring her safety and security, just as Freele relied on Aviles' representations that the cameras needed to be installed in her bedroom in order to protect her from a break-in. ADT has violated the Freeles in the most invasive way possible – peering into their most intimate and sacred moments unabashedly. ADT

wantonly violated the Freeles' privacy and did anything but keep the Freeles safe. In fact, thanks to ADT's wanton disregard of the Freeles' security, the Freeles will never feel safe in their home again.

35.     While Aviles has now been convicted and is awaiting sentencing for his actions, ADT has wholly failed to answer for its wrong-doing. Unfortunately, the Freeles continue to feel the impact of ADT's wrong-doing—every single day. In fact, Sarah Freele's own words perhaps best describe the continued torment that she feels from this incredible intrusion on her safety and security. In a statement to the U.S. Attorney's office, in conjunction with Aviles' sentencing, Ms. Freele wrote,

> This deliberate and calculated invasion of privacy is arguably more harmful than if I had installed no security system and my house had been burglarized. Objects can be replaced and windows can be fixed. Most people buy homeowner's insurance for just such an eventuality. However, Mr. Aviles' theft of my privacy, personal dignity, and peace of mind cannot be insured, because, after all, how does one place a price on the value of personal safety and security?

> The emotional and psychological impact of Mr. Aviles' actions are something I am having to cope with every day. Due to Covid-19, I like many people am working from home. As such, I am required to attend multiple video conferences and be "on camera" day in and day out. It is hard not to imagine and worry that a colleague is zooming in and watching me or that I'm being recorded. Every day that I am on camera, I am reminded of this event and become terribly uncomfortable. It is a travesty that I have to cope with this every day in order to do my job and provide for my family.

36.     ADT has wronged the Freeles in an unimaginable way, and the Freeles will be forced to endure the consequences of ADT's actions for the rest of their lives. It is time for ADT to answer for its wrongdoing.

## IV.     CAUSES OF ACTION

## COUNT ONE: VIOLATION OF THE DTPA

37.     Plaintiffs incorporate by reference herein the preceding paragraphs.

38.     Plaintiffs are" consumers" as that term is defined in Tex. Bus. & Com. Code Ann.

§17.45(4) because they are individuals.

39.     Plaintiffs engaged with Defendant in "[t]rade" or "commerce" as those terms are defined in Tex. Bus. & Com. Code Ann. § 17.45(6) because ADT offers for sale, sells, and/or leases goods and services (or otherwise articles, commodities, or other things of value) to consumers, including selling or leasing security products to Plaintiffs, and provides related security services, including the Pulse application, to Plaintiffs, in exchange for monetary payments.

40.     ADT engaged in false, misleading, and deceptive acts and practices in trade or commerce in violation of Tex. Bus. & Com. Code Ann. §17.46.

41.     ADT failed to disclose the fact that the smart home security services that it provided had material vulnerabilities, and that ADT had not taken reasonable measures to secure those services, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(24). ADT knew that consumers, including Plaintiffs, valued and expected that their smart home security devices would be secure and free from intrusion. At the same time, ADT knew that it was not taking reasonable measures, if any, to ensure that its smart home security devices, including the Pulse application, were actually secure. ADT failed to disclose these facts in order to induce consumers, including Plaintiffs, to continue purchasing its services, which they would not have done had this information been disclosed—as ADT knew from its survey of consumers in January 2020.

42.     ADT also represented that its Pulse home security system (and the employees that installed it) had characteristics that they did not in violation of Tex. Bus. & Com. Code Ann. §§ 17.46(b)(5) and (7). Specifically, ADT represented that its Pulse system  provided a "whole new level of security and convenience…" when, in fact, ADT's Pulse system was so vulnerable that its own employee was able to breach it hundreds of times with minimal effort. ADT also represented that its professional installation was "worry-free" and done by "highly-trained ADT technicians." The truth is, however, that ADT's technician easily found a way to hack into ADTs customers'

security accounts and spy on ADT's customers in their most intimate moments. ADT's Pulse system (including the installation process) was anything but safe and secure.

43.     Plaintiffs would not have continued to purchase ADT services had they known of the vulnerabilities in the Pulse application. Nor would they have continued to purchase ADT services had they known that ADT was not taking reasonable measures to secure its smart home devices.

44.     ADT's course of conduct was unconscionable in violation of Tex. Bus. & Com. Code Ann. § 17.50. ADT's core business is the widespread distribution of products and services to be used within consumers' homes to provide safety, security, and peace of mind. But while doing so, ADT acted with flagrant disregard for prudent and fair business practices—as ADT itself declared them in its January 2020 press release—that permitted ADT's technician, and potentially countless other technicians or employees, to grant themselves unfettered access to its customers' homes.

45.     Plaintiffs have also suffered and will continue to suffer economic damages, including, but not limited to: the cost of a replacement security device; the cost of additional surveillance and protective devices and services; and time spent monitoring and addressing the current and future consequences of the exposure enabled by ADT. Plaintiffs have also experienced mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

46.     Plaintiffs damages were proximately caused by ADT.

47.     Plaintiffs are also entitled to their reasonable attorney's fees pursuant to Tex. Bus. & Com. Code Ann. §§ 17.50(d).

**COUNT TWO: NEGLIGENT SUPERVISION AND RETENTION**

48.     Plaintiffs incorporate by reference herein the preceding paragraphs.

49.     At all times, Aviles was an employee of ADT and was acting in the course and scope of his employment by ADT.  Aviles' actions were within his general authority, in furtherance of ADT's business, and for the accomplishment of the object for which ADT was hired – namely, the installation and provision of security services and devices inside Plaintiffs' home.

50.     As Aviles' employer, ADT had a duty to use ordinary care in supervising its employee. ADT breached its duty by improperly supervising Aviles and doing nothing to prevent Aviles' unfettered and illegal access to Plaintiffs' home security system. ADT failed to follow up or review Aviles' installation of Plaintiffs' ADT pulse system, including independently verifying that the email accounts associated with Plaintiffs' ADT Pulse system actually belong to Plaintiffs. Under the guise of safety and security, ADT wholly failed to supervise Aviles and allowed Aviles to log on to Plaintiffs' security system and to intrude in the very home that ADT was falsely promising to keep safe. Such negligent supervision proximately caused Plaintiffs' injuries and damages. Plainly, ADT wholly failed to supervise Aviles and as a result, Aviles spied Plaintiffs' most intimate moments by logging into their security cameras over 389 times in just a matter of months.

51.     ADT's lack of follow up with Aviles' ADT Pulse installations allowed Aviles to repeatedly and systematically spy on ADT customers, including Plaintiffs, in the privacy of their own homes. Had ADT had even the most basic protocols in place—calling and asking its customers to independently verify the email addresses associated with their Pulse accounts, for example—then ADT would have easily discovered Aviles' wrong-doing years before it actually did, and it could have fired Aviles long before he ever made it to Plaintiffs' home.

52.     In failing to supervise Aviles and in negligently retaining Aviles, ADT allowed Aviles to commit an actionable tort against Plaintiffs—namely, invasion of privacy. Aviles intruded into Plaintiffs' home using video surveillance, and he viewed Plaintiffs in their most

protected and intimate space—their bedrooms. There is no question that this conduct is offensive to the ordinary person and that it is also violative of Texas law.

53.     As a result of ADT's negligence, Plaintiff suffered actual injury and damages, all in excess of the minimum jurisdictional limits of this Court.

54.     Exemplary damages.  Plaintiffs' injuries resulted from ADT's actual fraud, gross negligence, or malice, which entitles Plaintiffs to exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003(a).

## CONDITIONS PRECEDENT

55.     Plaintiffs aver that all conditions precedent have been performed or have occurred or have been waived by Defendant, and that every notice required by law to be given has been properly and timely given.

## ARBITRATION UNAVAILABLE

56.     The Residential Services Agreement between ADT and Freele, which is the contract that Freele executed with ADT to obtain her Pulse home security system, contains an arbitration provision.

57.     Pursuant to that arbitration provision, Plaintiffs initiated a consumer arbitration before the American Arbitration Association ("AAA") on November 10, 2020.[9] Just thirty days later, however, on December 10, 2020, the AAA, dismissed the arbitration, refunded Plaintiffs' filing fee, and directed Plaintiffs to file their cause of action in the state or federal court of Plaintiffs' choosing because ADT had wholly failed to comply with the AAA's rules.[10]

58.     Specifically, the AAA dismissed Plaintiffs' arbitration claim because ADT failed to register the arbitration clause that is contained in Plaintiffs' contract with the AAA. Pursuant to

---

[9] Attached as Exhibit 1 is a true and correct copy of Freele's November 10, 2020 Demand for Arbitration and Filing Confirmation from the AAA.
[10] Attached as Exhibit 2 is a true and correct copy of the AAA's December 10, 2020 letter denying arbitration.

Rule 12 of the AAA's Consumer Arbitration Rules, all corporations that wish to require arbitration pursuant to their consumer contracts must pre-register their arbitration clauses with the AAA. The AAA must review all consumer arbitration provisions in advance of any consumer arbitration to ensure that the arbitration provision comports with due process. Because ADT wholly failed to follow the AAA's rules, however, and did not register its arbitration clause with the AAA, the AAA dismissed Plaintiffs' arbitration and informed Plaintiffs that they could file their claims in the Court of Plaintiffs' choosing.

59.     Thus, should ADT attempt to compel arbitration, the Court should be aware that Plaintiffs tried, in vain, to arbitrate this dispute, but because ADT failed to do what it was legally required to do, arbitration is no longer available to Plaintiffs.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs Sarah Freele, Individually and as Next Friend of M.F., a Minor, pray that Defendant be cited to appear and answer, and that on final trial, Plaintiffs have:

1.     Actual, consequential, exemplary, compensatory, and special damages;

2.     Plaintiffs' past and future medical expenses;

3.     Plaintiffs' past and future pain and suffering;

4.     Plaintiffs' past and future mental anguish;

5.     Pre-judgment and post-judgment interest as allowed by law;

6.     Costs of court and attorneys' fees; and

7.     All other and further relief, both at law and in equity, to which Plaintiffs are entitled.

Dated: May 17, 2021

Respectfully submitted,


/s/ Elizabeth M. Branning
**Jon-Bernard Schwartz**
State Bar No. 90001829
jon@jbschwartzlaw.com
**Elizabeth M. Branning**
State Bar No. 24008069
liz@jbschwartzlaw.com
**JB SCHWARTZ PLLC**
Two Turtle Creek
3838 Oak Lawn Avenue
Suite 1000
Dallas, Texas 75219
Ph:     214.380.0751
Fax:    214.306.5174

**ATTORNEYS FOR PLAINTIFFS
SARAH FREELE, INDIVIDUALLY AND AS
NEXT FRIEND OF M.F.**


**AMERICAN ARBITRATION ASSOCIATION®**   **DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| |
|---|
| 1. Which party is sending in the filing documents? *(check one)*    Consumer    Business |
| 2. Briefly explain the dispute: |
| 3. Specify the amount of money in dispute, if any: $ |
| 4. State any other relief you are seeking:<br><br>   Attorney Fees    Interest    Arbitration Costs    Other; explain: |
| 5. Identify the requested city and state for the hearing if an in-person hearing is held:<br>City:                                                          State: |
| 6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed. |

**Consumer:**

| | | |
|---|---|---|
| Name: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |

**Consumer's Representative (if known):**

| | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |

**Business:**

| | | |
|---|---|---|
| Name: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |

| Business' Representative (if known): | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |
| Date: | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;
- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and
- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Welcome to File Online

# FILE ONLINE

AMERICAN ARBITRATION ASSOCIATION®

## FILING CONFIRMATION - Please print a copy for your records.

## AAA Case : 01-20-0015-6452

A case manager will be assigned to this case and will be in contact.

Basic Filing Information

Elizabeth M Cunningham ; liz@jbschwartzlaw.com ; 2148683438 ; arbitration ; Consumer Demand for Arbitration, Statement of Claim, and Contract between ADT LLC and consumer are attached.

Filing Fee Charged        $200.00

Case filed on 10 November 2020 at 14:16 Eastern Time

This transaction has been approved.

© 2020 American Arbitration Association

File Online (ver 4.1 v3)

Contact        Privacy        Terms of Use        Secure Case Administration

Follow AAA®

**Exhibit 2**



1101 Laurel Oak Road
Voorhees, NJ 08043

December 10, 2020

Jon-Bernard Schwartz, Esq.
JBSchwartz, PLLC
2 Turtle Creek
3838 Oak Lawn Avenue
Suite 1000
Dallas, TX 75219
Via Email to: jon@jbschwartzlaw.com

Charles C. Eblen, Esq.
Shook, Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO 64108
Via Email to: ceblen@shb.com

**Case Number: 01-20-0015-6452**

Sarah Freele, individually, and
on behalf of her minor son, M.F.
-vs-
ADT LLC

Dear Parties:

Claimant has filed with us a demand for arbitration. We note that the arbitration clause provides for arbitration by
the American Arbitration Association ("AAA").

Prior to the filing of this arbitration, ADT LLC failed to comply with the AAA's policies regarding consumer
claims. Accordingly, we must decline to administer this claim and any other claims between ADT LLC and its
consumers at this time. These policies can be found on our web site, www.adr.org, in the Consumer Due Process
Protocol ("Protocol") and the Consumer Arbitration Rules ("Consumer Rules"), including the Costs of
Arbitration.

Accordingly, we have administratively closed our file and will refund any payment received by the filing party.
According to R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party
may choose to submit its dispute to the appropriate court for resolution.

If you believe we have declined this matter in error, please email ConsumerFiling@adr.org .

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain
electronic case documents in our electronic records system. Such electronic documents may not constitute a
complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely,
electronic case documents will be destroyed 3 months after the date of this letter.

If ADT LLC advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration
Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole
discretion, accepting newly filed consumer cases going forward. Therefore, if ADT LLC wishes for the AAA to
consider accepting consumer disputes going forward, ADT LLC must, at a minimum, register its clause on the

Consumer Clause Registry on our website, www.adr.org/clauseregistry. Upon completion of the registration process and confirmation from the AAA that the business is now active on the Consumer Clause Registry, ADT LLC is responsible for informing all parties that Claimant may re-file their claim.

Sincerely,

Consumer Filing Team
ConsumerFiling@adr.org
Fax: (877) 304-8457

cc:  Kimberly L. Ross
      Elizabeth M. Cunningham, Esq.